UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OMAR BONNER, ) | |
| ) | |
| Petitioner, ) | Civil Action No. |
| ) | 23-11822-FDS |
| v. ) | |
| ) | |
| NELSON ALVES, ) | |
| ) | |
| Respondent. ) | |

MEMORANDUM AND ORDER ON
PETITION FOR WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

This is an action by a state prisoner seeking a writ of habeas corpus. Petitioner Omar Bonner is an inmate at the Massachusetts Correctional Institution-Norfolk. Respondent Nelson Alves is the superintendent of that facility. After two trials in 2016 and 2017, Bonner was convicted of first-degree murder, unlawful possession of a firearm, and resisting arrest. He was sentenced to a term of life imprisonment.

Bonner now seeks habeas relief pursuant to 28 U.S.C. § 2254. He contends that insufficient evidence was presented at trial to support a guilty verdict as to the convictions for first-degree murder and unlawful possession of a firearm, and that his continued incarceration violates his right to due process.

The Supreme Judicial Court ("SJC") previously considered and rejected those claims. Because the Court finds no reason to disturb those conclusions, and for the reasons set forth below, the petition will be denied.

I.  **Background**

   A.  **Factual Background**

The SJC recounted the facts of the case as follows:

   a. Evening of the shooting.  On the evening of December 13, 2013, the victim attended a music performance at a nightclub on Blue Hill Avenue.  The victim drove his brother and his girlfriend, among others, to the event in a Ford Explorer, and he parked around the corner from the venue.

   [Petitioner], Denton, Robertson, and Watson attended the same performance.  [Petitioner] had borrowed his sister's silver Toyota RAV4 to drive to the event.  Watson drove a red Lincoln MKX that had been rented by his girlfriend the evening before, and that had been given to Watson that day.

   There was no dispute that the four codefendants knew each other, and multiple pieces of evidence were introduced to support their close ties.  An event photograph depicted three of the men—[petitioner], Denton, and Robertson—standing near one another.  [Petitioner] is depicted in the photographs wearing a bright red shirt, matching bright red pants, a red hat with a pom-pom on top, and a plaid scarf.  Denton is seen wearing a black wool hat and a maroon V-neck sweater over a white shirt.  Robertson appears to be wearing a hat and, in some photographs, to be concealing his face with a dark scarf.

   The Commonwealth also introduced cellular telephone records showing [petitioner], Denton, Robertson, and Watson sending text messages to each other, as well as placing calls, in the month leading up to the shooting and within minutes of the shooting.  Indeed, [petitioner]'s mother and sister both characterized Denton as a close family friend.  In addition, crime scene investigators found fingerprints that were matched to all four men inside and outside the recently rented (and cleaned) MKX.

   After the show, the victim went outside, presumably to retrieve his vehicle, but he did not return to the club to pick up his brother and his girlfriend.[1]

   The shooting was captured by surveillance cameras mounted to the exterior of a residence on a residential street that intersected Blue Hill Avenue near the nightclub.  The video footage depicts two sport utility vehicles (SUVs), consistent with a Lincoln MKX and a Toyota RAV4, being driven down the street together, with the MKX in the lead.  The street is a one-way residential street; traffic flows west to east from Morton Street to Blue Hill Avenue.  The drivers and the occupants (if any) of the SUVs are not visible in the video footage.

---

[1] None of the witnesses observed an altercation inside the club, nor were they aware of any existing problems between the victim and the codefendants.

Approximately three minutes later, the victim's vehicle is seen being driven down the street and parallel parking into a space in front of the residence.

As the victim is finishing parking, an individual alleged to be Robertson runs into view from the direction of Morton Street.[2] The individual approaches the driver's side of the Explorer and fires multiple rounds through the front window on the driver's side. The SUV lurches forward, striking a pickup truck. Another vehicle, alleged to be the Lincoln MKX driven by Watson, immediately pulls up alongside the Explorer, the shooter gets in, and the vehicle speeds away. The victim somehow manages to move across the seat, open the front passenger's side door, fall to the curb, and move a few feet along the sidewalk on his stomach, toward the rear of the vehicle. The MKX continues to Blue Hill Avenue and turns right. According to the Boston police department's ShotSpotter system,[3] the volley was fired at precisely 1:45:00 a.m. The next shooting, as detected by the ShotSpotter system, occurred forty seconds later, at 1:45:40 a.m. Video footage taken from the home security system depicts the following events.[4]

After the MKX speeds off, the victim lies wounded on the sidewalk near the passenger's side of the Explorer, with his feet moving. At 1:53:57 a.m., an individual alleged to be Denton runs down the sidewalk from the direction of Blue Hill Avenue (and the nightclub) toward the victim. The individual hurriedly crosses the street at a diagonal, glancing over his shoulder toward the intersection with Blue Hill Avenue. At 1:54:03 to 1:54:04 a.m., the individual, brandishing a handgun, approaches the victim from the driver's side rear of the Explorer. At 1:54:05 a.m., the individual stands above the victim. At that moment, another individual, alleged to be [petitioner], walks down the street and into the camera's view from the direction of Blue Hill Avenue. A second later, the man standing over the victim takes a few steps backward, squares his body into a shooting stance, and levels the gun at the victim, but the gun does not fire. At that point, the individual alleged to be [petitioner] is standing on the opposite sidewalk, looking at the shooter and moving in the shooter's direction.

Between 1:54:07 and 1:54:10 a.m., the shooter appears to "rack" the slide of the gun. He once again aims it at the victim as the other individual walks across the street to join him. At 1:54:11 to 1:54:12 a.m., the shooter fires four rounds at the victim in rapid succession. As the gunfire erupts, the individual alleged to be [petitioner] is in the middle of the street moving toward the shooter. The second shooter continues to point the gun at the victim for two more seconds, but no further shots are fired. By that time, the other individual, assertedly [petitioner], is standing next to the shooter at the rear of the Explorer. From

---

[2] The footage is not sufficiently clear to be able to see any of the individuals' faces.

[3] A Boston police officer explained that ShotSpotter is a network of acoustic gunshot detection sensors.

[4] The times indicated refer to the time stamp on the security video footage, and not the actual time. The homeowner acknowledged that the system was not set to "the right time." We refer to the time stamp imprinted on the security video recordings, which were introduced in evidence and played to the jury.

3

1:54:14 to 1:54:15 a.m., the shooter steps away from the victim; the other man exchanges places with him and kicks the victim in the head. During the next three seconds, the two men, with the shooter in the lead, cross the street and run toward Blue Hill Avenue. Police arrive at 1:55:34 a.m.

A resident of the house with the security camera was awoken at around 1:45 a.m. by four or five gunshots. He then heard what he thought was the sound of something bumping into his parked pickup truck. He looked out the second-floor window and saw the victim roll out of the passenger's side of the Explorer and collapse to the ground. The witness then observed "two guys coming down the street" from the direction of Blue Hill Avenue. One of the men, by inference Denton, "did a motion with a handgun . . . like a reset," and pointed the gun at the victim on the ground. The witness heard more gunfire. He also saw the second individual, by inference [petitioner], kick the victim. [Petitioner] exclaimed, in a voice loud enough for the witness to hear, "dirty mother fucker." On cross-examination, the witness explained that he believed [petitioner] had kicked an unresponsive, and presumably lifeless, body. He saw the shooter and the other man turn around and run down the street toward Blue Hill Avenue.

b. _Police investigation and forensic evidence._ Another neighbor called 911 to report the shooting. By that time, police had received ShotSpotter alerts of two separate shootings in the vicinity. Police responded to the scene and found the victim lying face up on the sidewalk next to the bullet-ridden Explorer. Police found ten nine-millimeter shell casings on the ground near the Explorer and four discharged projectiles inside the vehicle. These had been fired from the same weapon used to shoot the victim. The nine-millimeter weapon itself was never found. Police also recovered four .380 shell casings and three live rounds of .380-caliber ammunition from the street.[5] The shell casings and projectiles were fired from a .380 pistol that was recovered a short time after the shooting. . . .

The autopsy revealed that the victim had been shot nine times by a nine-millimeter handgun, and twice in the head by a .380 caliber handgun. He died from multiple gunshot wounds to the head, torso, and lower extremities. The medical examiner opined that either .380-caliber gunshot wound to the head could have caused immediate death.

At 1:45 a.m. on December 14, 2013, Boston police Detective Brian Smigielski was inside the area B-3 police station when he heard gunshots fired from two different weapons.[6] Smigielski drove toward the scene in an unmarked vehicle. En route, he observed a RAV4 turn recklessly from Baird Street onto

---

[5] A Boston police department ballistician testified that live rounds already chambered in a semiautomatic pistol can be ejected from the firearm if the operator pulls (or "racks") the slide mechanism backwards.

[6] Smigielski, who had been assigned to the youth violence strike force, resigned from the Boston police department in January 2016, after being charged in Federal court with conspiracy to defraud the United States. In pleading guilty, he admitted that he had impeded a Federal investigation into gang activity by supplying gang members with confidential information.

4

Morton Street.[7] Smigielski followed the RAV4 through several residential streets, while it reached speeds of up to sixty miles per hour and went through a red light. The unmarked vehicle was not equipped with blue lights or a siren, and Smigielski did not attempt to stop the RAV4. The RAV4 eventually slowed down to the speed limit and traveled into the Hyde Park section of Boston. It then turned into the driveway of a house that later was learned to be [petitioner]'s family home. Smigielski parked behind the RAV4. [Petitioner] opened the front passenger's side door and stepped out. With his firearm held by his side, Smigielski ordered [petitioner] to get back into the vehicle. [Petitioner] instead ran toward the rear of the house. Smigielski saw something in [petitioner]'s hand, but Smigielski could not tell what it was. He yelled to the driver, Denton, to stay put, and chased after [petitioner].

Smigielski followed [petitioner]'s path down the driveway to a detached garage. He lost sight of [petitioner] but heard something heavy hit the ground in the yard where [petitioner] had run. [Petitioner] then emerged from behind the garage with his hands in his pockets. Smigielski ordered [petitioner] to the ground; [petitioner] complied but then attempted to get up, and a struggle ensued. At the same time, other police officers arrived at the house and encountered Denton in the driveway. Denton fled, but he eventually was found hiding underneath a pickup truck parked in the driveway of a house on a nearby street.[8]

After [petitioner]'s arrest, police backtracked along the path that [petitioner] had traveled while running from Smigielski. They located [petitioner]'s red hat toward the back of the driveway, near the garage doors. Officers also found a .380 handgun in the back yard of the house behind the garage. The firearm was on the ground on the other side of a fence that separated the two properties. Although there was snow on the ground, there was no snow on the .380 caliber handgun. Testing established that the firearm had fired the shell casings found on the street where the victim had been shot, as well as the projectiles found in the victim's head.

Later that morning, police found the Lincoln MKX abandoned and blocking a driveway on a street approximately one block from [petitioner]'s home. The MKX was pinned against a fence post; it was still running, and its reverse lights were on.

*Commonwealth v. Bonner*, 489 Mass. 268, 270-74 (2022) (footnotes in original).

---

[7] Smigielski's characterization of the RAV4 as fleeing the crime scene was hotly contested. In a radio broadcast, he informed fellow officers that he was trying to catch up with the car "fleeing that scene." Defense counsel pointed out that Smigielski did not observe the RAV4 being driven away from the scene. Smigielski explained that he meant to say that the vehicle was "fleeing the area" of the shooting.

[8] Police recovered a .25 caliber handgun on a walkway on the other side of a fence from the RAV4. It contained Denton's fingerprint. As discussed, this evidence was excluded from the second trial.

### B. State Proceedings

Petitioner was indicted on February 14, 2014, along with codefendants Andrew Robertson, Omar Denton, and Javaine Watson. On June 24, 2016, a jury found petitioner guilty of unlawful possession of a firearm and resisting arrest, but they could not reach a verdict as to the murder charge for any of the defendants. *Bonner*, 489 Mass. at 274. A mistrial was declared as to those charges. *Id.*

After a second trial, the jury found petitioner guilty of first-degree murder on theories of deliberate premeditation and extreme atrocity or cruelty. *Id.* at 275. Petitioner was then sentenced to life without parole for the murder conviction, four to five years for the firearm conviction, and two years for the resisting-arrest conviction. *Id.* Petitioner appealed and was granted direct appellate review by the SJC.

On appeal, petitioner contended that (1) "the evidence was insufficient to sustain his murder conviction"; (2) "a new trial [was] warranted because of erroneous accomplice liability instructions"; (3) "the sufficiency of evidence introduced in the first trial that he unlawfully possessed a firearm"; and (4) "the judge's decision, in the second trial, to preclude the defendant from contesting that point on estoppel grounds." *Id.* at 269. The SJC rejected each of those contentions and affirmed the convictions on March 7, 2022. It also denied a petition for rehearing and reconsideration on May 16, 2022.

### C. Federal Proceedings

The petition for a writ of habeas corpus was filed in this court on August 9, 2023.[9] The

---

[9] Section 2244(d) imposes a one-year limitations period for habeas-corpus petitions by state prisoners. As relevant here, the limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 18 U.S.C. § 2244(d)(1)(A). Judgments are considered "final" for those purposes "when the ninety-day period for seeking *certiorari* expire[s]." *Neverson v. Farquharson*, 366 F.3d 32, 36 (1st Cir. 2004). The one-year limitations period began to run on Bonner's petition on August 14, 2022, 90 days after the SJC denied his request for reconsideration. His petition is therefore timely.

6

petition asserts that the evidence as to the convictions for first-degree murder and for unlawful possession of a firearm was legally insufficient.  Petitioner contends that those insufficiencies violated his constitutional due-process right to be convicted only upon proof beyond a reasonable doubt of every element of a crime.

**II.      Legal Standard**

Under 28 U.S.C. § 2254(d), a federal court may not issue a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state-court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state-court decision is "contrary to" clearly established federal law if it (1) "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or (2) resolves a case differently from the Supreme Court on a set of "materially indistinguishable" facts.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  In either scenario, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to Supreme Court precedent.  *Williams*, 529 U.S. at 405.

A state-court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions but applied it in an objectively unreasonable manner.  *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409).  The Supreme Court has cautioned that "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Williams*, 529 U.S. at 410.  The state court's application of federal law must be "more than

7

incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (citing *Williams*, 529 U.S. at 410, 412); *see also Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong; 'unreasonable' here means something more than incorrect or erroneous."). Furthermore,

> if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application . . . . [S]ome increment of incorrectness beyond error is required. The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court.

*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (citations and quotation marks omitted). Habeas relief is intended to protect petitioners from "extreme malfunctions in the state criminal justice systems." *Jackson v. Virginia*, 443 U.S. 307, 322 n.5 (1979). It is not a "substitute for ordinary error correction through appeal." *Harrington v. Ritcher*, 562 U.S. 86, 102-03 (2011).

Under § 2254(d)(2), meanwhile, there is "a separate and exacting standard applicable to review of a state court's factual findings." *Pike v. Guarino*, 492 F.3d 61, 68 (1st Cir.2007) (citing, *inter alia*, 28 U.S.C. § 2254(e)(1)). There is a presumption that factual findings by the state court are correct, and the habeas court must defer to such findings. *Sanna v. Dipaolo*, 265 F.3d 1, 10 (1st Cir. 2001). "[A] habeas petitioner can rebut this presumption by adducing 'clear and convincing evidence'" that convinces the habeas court "that the underlying state court's adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting 28 U.S.C. § 2254(d)(2)); *see also Teti*, 507 F.3d at 57. Moreover, the "special prophylaxis of § 2254(d)(2) applies only to determinations of 'basic, primary, or historical facts.'" *Ouber v. Guarino*, 293 F.3d 19, 27 (1st Cir. 2002) (quoting *Sanna*, 265 F.3d at 7). "Inferences, characterizations of the facts, and mixed fact/law conclusions are more appropriately analyzed under the 'unreasonable application' prong of § 2254(d)(1)." *Id.*

**III.     Analysis**

Petitioner contends that the evidence offered at trial was legally insufficient to support his murder conviction or unlawful possession of a firearm conviction. He alleges that no rational trier of fact could have found beyond a reasonable doubt that he was a "knowing participant" in the shooting or possessed the requisite state of mind, and that the SJC made unreasonable findings of fact based on the evidence introduced at trial. In support of those arguments, he points to a lack of evidence establishing his participation in the crime and the circumstantial nature of the evidence upon which the Commonwealth relied.

**A.     Applicable Standard**

Challenges to the sufficiency of the evidence on direct review require courts to ask "whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Gomes v. Silva*, 958 F.3d 12, 20 (1st Cir. 2020).[10] The court will "not view each piece of evidence separately, reweigh the evidence, or second-guess the jury's credibility calls." *United States v. Seary-Colón*, 997 F.3d 1, 12 (1st Cir. 2021). Reasonable inferences that may be drawn from the evidence must also be viewed in light most favorable to the prosecution. *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (quoting *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995)). Direct evidence is not necessary, as "a criminal conviction may be supported by circumstantial evidence alone." *Gomes*, 958 F.3d

---

[10] In assessing the sufficiency of evidence, Massachusetts courts employ a standard set forth in *Commonwealth v. Lattimore*, 378 Mass. 671 (1979). The First Circuit has held that standard to be "functionally identical" to that articulated by the Supreme Court in *Jackson v. Virginia*. *Logan v. Gelb*, 790 F.3d 65, 71 (1st Cir. 2015). Therefore, when the Supreme Judicial Court reviews for *Lattimore* error, it simultaneously "answer[s] the federal constitutional question." *Roman v. Mitchell*, 924 F.3d 3, 6 n.1 (1st Cir. 2019) (quoting *Housen v. Gelb*, 744 F.3d 221, 225 (1st Cir. 2014)).

at 20.  "In gauging a sufficiency-of-the-evidence claim, an inquiring court views the facts as a whole, not in splendid isolation." *Webster v. Gray*, 39 F.4th 27, 38 (1st Cir. 2022).

In a federal habeas petition, the applicant must overcome a standard of review that is "twice-deferential." *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  The petitioner must show both that the evidence introduced at trial fell short of the standard articulated in *Jackson*, and that the state court unreasonably determined otherwise.  *See Gomes*, 958 F.3d at 21; *Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016) ("a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable'" (quoting *Parker*, 567 U.S. at 43)).  "Unreasonable" means that the decision "evinces some increment of incorrectness beyond mere error." *Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014) (quoting *Leftwich v. Maloney*, 532 F.3d 20, 23 (1st Cir. 2001)).

### B. First-Degree Murder

Under Massachusetts law, to convict a defendant of first-degree murder, the Commonwealth is required to prove beyond a reasonable doubt that the defendant participated in an intentional killing committed with deliberate premeditation, "extreme atrocity or cruelty," or during the commission of a felony.  Mass. Gen. Laws ch. 265, § 1.  To convict a defendant as a joint venturer of a crime, the Commonwealth must prove that he "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for the offense." *Commonwealth v. Rakes*, 478 Mass. 22, 32 (2017).  It need not establish a defendant's precise role in the crime, provided the evidence shows that he participated in some way.  *See Commonwealth v. Silva*, 471 Mass. 610, 621 (2015) ("[W]hat matters is only that there be proof of . . . the defendant's knowing participation in some manner in the commission of the offense.").

On direct review, the SJC determined that a reasonable jury, based on the evidence presented, could have found that "the defendant participated in the shooting with the shared intent to kill the victim," considering the following findings:

> [It] was established by evidence that (1) the victim was attacked by a group of individuals acting in concert; (2) the defendant was present at the scene of the second shooting, in a position to render aid if necessary, and demonstrated active hostility to the victim through verbal insults and kicking the mortally wounded victim in the head; (3) the defendant facilitated the second shooter's escape from the scene by supplying the getaway vehicle and an intended place of safety to which to flee; and (4) the defendant attempted to hide the murder weapon.

*Bonner*, 489 Mass. at 277-78.

Petitioner contends that the SJC's determination was unreasonable because (1) there was no direct evidence of his "knowing participation" in the joint venture before or during the commission of the crime; (2) there was no direct evidence of the state of mind required for first-degree murder; and (3) the SJC's decision was based on a combination of impermissible inferences.

### 1.     Knowing Participation

Petitioner first suggests that the SJC's determination was unreasonable because his presence at the crime scene and association with the other defendants are not sufficient to establish that he participated in a coordinated effort to cause the victim's death. He further contends that his presence at the scene, and his allegedly kicking the victim, are not enough to show his prior knowledge or coordination of the crime.

Petitioner offers several alternative explanations for his presence at the crime scene, the telephone calls placed to the codefendants, and his actions when faced with an active shooter. In his telling, he planned to attend a musical performance but became "captive to the environment and circumstances that would later unfold." (Pet. Mem. at 19, ECF No. 14). He also points out that there is no direct evidence that he agreed or intended to cause the victim's death.

11

As the SJC acknowledged, petitioner is correct as a general matter that his mere presence or association, without more, would be an insufficient basis for a jury to conclude that he participated in a joint venture. *Id.* at 280-81; *see Commonwealth v. Montalvo*, 76 Mass. App. Ct. 319, 330 (2010) ("evidence that a defendant associated with persons who committed the crime does not lead to an inference that he also participated in the crime"); *Commonwealth v. Costa*, 407 Mass. 216, 224 (1990) ("Mere presence at the scene with knowledge of the planned act is insufficient alone to support a conviction on a theory of joint venture.").

But circumstantial evidence may nonetheless provide an adequate basis from which a jury could infer petitioner's involvement, including both his knowledge and actual participation. *Gomes*, 958 F.3d at 20. And this principle applies with greater force when considering the deference afforded to state-court decisions under habeas review. *See Magraw v. Roden*, 743 F.3d 1, 6 (1st Cir. 2014). It does not matter whether that circumstantial evidence might be susceptible to a "plausible alternative interpretation," but whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Morgan*, 667 F.3d at 53 (quoting *Jackson*, 433 U.S. at 319). Courts may not "second guess a jury's verdict where it has chosen a reasonable interpretation of the evidence before it." *Id.* at 54.

Here, the evidence was that petitioner planned for some time to attend a musical performance on December 13, 2013, along with his codefendants. *Bonner*, 489 Mass. at 270. He left that performance, and the RAV4 he was driving that night was seen with the MKX driven by another codefendant. *Id.* Petitioner made multiple telephone calls to both defendants accused of shooting the victim in the minutes before and after the incident. *Id.* at 322. After witnessing one of those shooters in the act, the person alleged to have been petitioner then kicked the victim in the head, shouting "dirty motherfucker." *Id.* at 284. After the shooting, the

second shooter and the petitioner drove away in a RAV4 that petitioner had driven earlier that night, and was owned by his sister. *Id.* at 280. Once the car was stopped by police, petitioner fled and, according to the jury's findings, disposed of a weapon used in the shooting. *Id.*

Although some or all of those facts might be susceptible to alternative explanations to the one put forth by the Commonwealth, "the jury were not required to accept [petitioner]'s explanation" of how or why events unfolded as they did. *Bonner*, 489 Mass. at 322. The Commonwealth was not required to demonstrate an express agreement between petitioner and his codefendants, only to provide sufficient evidence from which a jury could infer that petitioner knew their objective and participated in it. *See Facey v. Gleb*, 2018 WL 3323826, at *3 (D. Mass. July 6, 2018). Even "when the record is fairly susceptible to two competing scenarios, the choice between those scenarios ordinarily is for the jury." *United States v. Dwinells*, 508 F.3d 63, 74 (1st Cir. 2007).

Similarly, although evidence of petitioner's actions after the crime was committed cannot alone establish a joint venture, it is nonetheless probative in understanding the preceding events. For example, petitioner's telephone calls to his codefendants in the minutes before the shooting, standing alone, might have an innocent or inculpatory explanation, but petitioner's actions after the fact might allow a jury to infer that those communications had criminal intent.

The SJC thus did not err in concluding that there was sufficient evidence from which the jury could infer that petitioner was a knowing participant in the joint venture alleged by the Commonwealth.

### 2.   State of Mind

Petitioner next suggests that the evidence was not sufficient to show either deliberate premeditation or "extreme atrocity or cruelty."

Under Massachusetts law, to convict a person of a specific intent crime requires the Commonwealth to prove that he shared the principal actor's intent. *Commonwealth v. Mandile*, 403 Mass. 93, 100 (1988). The defendant's intent may be inferred from the totality of the circumstances, including his actions leading up to, during, and following the crime. *See Gomes*, 958 F.3d at 23 ("the knowledge and intent necessary to convict on a theory of joint venture may be inferred from concerted action between the defendant and a principal"); *Commonwealth v. Longo*, 402 Mass. 482, 489 (1988); *Commonwealth v. Gonzalez*, 475 Mass. 396, 414-15 (2016); *Commonwealth v. Sosa*, 493 Mass. 104, 117 (2023).

Here, the evidence of petitioner's conduct provided sufficient grounds from which a reasonable jury could infer that he possessed the requisite state of mind. The surveillance-camera footage showed petitioner observe Denton shooting the victim on the ground. *Bonner*, 489 Mass. at 283. Petitioner then walked over to the shooter, who continued to point the weapon at the unresponsive victim. *Id.* He then kicked the victim in the head while calling him a "dirty motherfucker." *Id.* After the shooting, petitioner assisted Denton escape, and then sought to hide a weapon involved in the shooting. *Id.* Again, those acts are sufficient to support the jury's finding—and the SJC's determination—that petitioner shared the necessary intent to kill.

Petitioner suggests that the kick to the head and the pejorative were simply the "distasteful" act of a "young man," and that it would be fundamentally unfair to consider it probative of his state of mind before the act itself. (Pet. Mem. at 40). But a defendant's conduct toward a victim after a lethal act—particularly hostile or aggressive conduct—may allow a jury to infer a shared intent to kill. *See Facey*, 2018 WL 3323826, at *3 (finding shared intent when, "after the victim was shot six times by [a codefendant], [the petitioner] walked up to the motionless victim and kicked him in the face before fleeing the scene"); *Commonwealth v.*

14

*Norris*, 462 Mass. 131, 140 (2012) (finding sufficient evidence of shared intent when, after a violent altercation ending in a codefendant shooting the victim six times, the defendant walked over to the victim and kicked him in the face); *Commonwealth v. Pov Hour*, 446 Mass. 35, 43 (2006) (sufficient evidence of intent for murder conviction on theory of extreme atrocity or cruelty where defendant continued to punch and kick victim, who was unresponsive on the ground, after codefendant had stopped).

Accordingly, the SJC's decision was correct in holding that there was sufficient evidence from which a jury could infer petitioner's culpable state of mind. That decision thus did not show any "increment of incorrectness beyond mere error," and does not provide any ground for habeas relief. *Winfield*, 775 F.3d at 8.

### 3. Totality of the Evidence

Finally, petitioner contends that the SJC impermissibly combined "possible" inferences based on conjecture to arrive at its conclusion, which he asserts cannot amount to proof beyond a reasonable doubt.

"Guilt beyond a reasonable doubt cannot be premised on pure conjecture. But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." *Stewart v. Coalter*, 48 F.3d 610, 615-16 (1st Cir. 1995). While a reviewing court should be "loath to stack inference upon inference in order to uphold the jury's verdict," so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt, it "need not exclude every reasonable hypothesis of innocence." *O'Laughlin v. O'Brien*, 568 F.3d 287, 301 (1st Cir. 2009) (citations omitted). Indeed, "when the record is fairly susceptible to two competing scenarios, the choice between those scenarios ordinarily is for the jury." *Dwinells*, 508 F.3d at 74.

Here, as discussed, the inferences upon which the SJC relied to come to its conclusions were reasonable and based on the totality of the evidence before it. While each inference may have been plausibly rationalized by another scenario, the jury was not required to adopt petitioner's explanation of events, nor did the SJC commit error when it drew upon the totality of the circumstances before it came to its conclusions.

Furthermore, a challenge under § 2254(d)(2) is not cognizable here. Petitioner challenges three factual determinations made by the SJC: (1) that he acted in concert with the other defendants, (2) that he stood by as another defendant shot the victim as if a "stationary, observing presence," and (3) that he facilitated that defendant's escape. (Pet. Mem. at 27-28, 34, 37). But none of those conclusions are essential "basic, primary, or historical facts," but rather "[i]nferences, characterizations of the facts, and mixed fact/law conclusions." *Ouber*, 293 F.3d at 27. Accordingly, any such challenge is properly raised under § 2254(d)(1). *Id.*

Therefore, the SJC's decision satisfies the *Jackson* standard because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 433 U.S. at 319. The decision does not show an "increment of incorrectness beyond mere error." *Winfield*, 775 F.3d at 8. Thus, there is no insufficiency of the evidence that would provide an adequate ground to grant habeas relief as to petitioner's conviction for first-degree murder.

### C. Unlawful Possession of a Firearm

Under Massachusetts law, to convict a defendant of unlawful possession of a firearm, the Commonwealth it required to prove that the defendant knowingly possessed a firearm (as defined in Mass. Gen. Laws ch. 140, § 121) and did not have a license for that firearm. Mass. Gen. Laws ch. 269, § 10(a); *Commonwealth v. Romero*, 464 Mass. 648, 652 (2013). "Possession" may be either actual or constructive. *Romero*, 464 Mass. at 652-53. When, as

relevant here, the firearm is not recovered on the defendant's person, "[p]roof of constructive possession requires the Commonwealth to show 'knowledge coupled with the ability and intention to exercise dominion and control'" of the firearm. *Id.* at 763 (quoting *Commonwealth v. Brzezinski*, 405 Mass. 401, 409 (1989)). As in other circumstances, knowledge and intent may be established by circumstantial evidence. *Commonwealth v. Ralph R.*, 100 Mass. App. Ct. 150, 163 (2021), *aff'd*, 490 Mass. 770 (2022).

Here, the SJC determined that a reasonable jury, based on the evidence presented, could have found petitioner guilty of unlawful possession of a firearm, considering the following findings:

> [T]he evidence established that the victim was shot with a .380 caliber firearm. The shooter and the man who kicked the downed victim ran from the scene on foot, and they were next spotted "leaving the area" in a small SUV. Having been alerted to the shooting, and while heading to the scene, Smigielski encountered and followed the fleeing vehicle until it turned into the driveway of what was learned to be the defendant's house. The defendant got out of the RAV4 from the front passenger's seat and ran into the back yard. Smigielski chased him and then lost sight of him, but heard "an object hit the ground." Minutes later, another police officer retraced the [petitioner's] path and located a .380 caliber handgun lying on top of the snow. Ballistics testing established that this firearm was the same weapon that had fired the fatal rounds.

*Bonner*, 489 Mass. at 287-88.

The evidence cited by the SJC is more than sufficient to infer that petitioner unlawfully possessed the handgun after getting out of the SUV. Although other inferences might be possible from that evidence, this court "may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict." *Magraw*, 743 F.3d at 7. Here, Detective Smigielski chased petitioner from the SUV, heard "an object hit the ground," and soon after found the firearm in question along petitioner's route. *Bonner*, 489 Mass. at 287-88. The SJC reasonably concluded that the jury could infer from those facts that petitioner had unlawfully possessed that firearm.

Finally, petitioner also challenges the SJC's factual finding under § 2254(d)(2) that based on the evidence introduced at trial, the handgun was found "in the back yard of the house behind the garage" of 295 Wood Avenue, in Hyde Park, Massachusetts, where petitioner ran after being confronted by Smigielski. *Id.* at 274. Although it did not identify the precise location of that handgun, the SJC noted that it was discovered "on the ground on the other side of a fence that separated" 295 Wood Avenue and 102 Lewiston Street. *Id.* At trial, the Commonwealth elicited testimony that the handgun was recovered at 102 Lewiston Street. (Def. Ex. 21, June 8, 2016 Trial Tr. at 183-88, ECF No. 13-21).

Petitioner contends that the area behind the right side of his garage was actually 10-12 Edwardson Street, which neighbors 102 Lewiston Street, and the handgun's location at the latter address is more consistent with the path of his codefendant, Denton, who was discovered hiding under a car at a further address, 104 Lewiston Street.

Petitioner's address at 295 Wood Avenue does indeed abut both 10-12 Edwardson Street and 102 Lewiston Street. The SJC's factual finding, therefore, was not in error, and petitioner has produced no evidence—let alone clear and convincing evidence—that would overcome the presumption of its accuracy. To the extent that petitioner challenges the inference that he would have had to throw the handgun some distance from the location Smigielski could not see him to the location it was ultimately discovered, that again is not a cognizable claim under § 2254(d)(2), but is more appropriately considered under § 2254(d)(1). *Ouber*, 293 F.3d at 27.

Accordingly, because the SJC did not err in finding that a reasonable jury could find petitioner guilty of unlawful possession of a firearm, and made no unreasonable factual findings in the course of that finding, its decision does not provide any ground for habeas relief. *Winfield*, 775 F.3d at 8. The petition will therefore be denied.

## IV. <u>Conclusion</u>

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 7, 2024                     Chief Judge, United States District Court